OPINION OF THE COURT
Martin Schoenfeld, J.
In this interesting and well-briefed CPLR article 78 proceeding the sole legal issue presented, simply stated, is whether the "substantial rehabilitation” of a multiple dwelling terminates the "rent stabilization” protection of a tenant in continuous occupancy of an unimproved apartment. Petitioner landlord Tatiana Copeland now moves (1) to vacate a determination by respondent agency New York State Division of Housing and Community Renewal (DHCR) that a rehabilitation did not terminate stabilization protection, and (2) for a judgment declaring that the subject building was substantially rehabilitated and that the subject apartment is exempt from the Rent Stabilization Law and Code (RSL). DHCR now cross-moves to dismiss the petition for failure to state a cause of action. For the reasons set forth herein, the relief requested in the petition is denied and the petition is dismissed.
BACKGROUND
Respondent tenant Lael Scott (Scott) began residing in apartment 2 (the apartment) in the building known as and located at 136 West 11th Street, New York, New York (the building) pursuant to a sublease in or about 1971. She became the prime tenant pursuant to a lease in her name commencing November 1, 1973. On June 20, 1974, the New York City Council passed the "Emergency Tenant Protection Act of Nineteen Seventy-Four” (L 1974, ch 576, §4 [McKinney’s Uncons Laws of NY §§ 8621-8634] [ETPA]), subjecting the apartment to "rent stabilization.” Scott has resided in the apartment continuously for the past 23 years, and until the events here in issue her landlords continually entered into rent-stabilized renewal leases with her.
Petitioner purchased the building on November 23, 1983. Solely for purposes of the instant decision this court will accept, arguendo, petitioner’s contention that in or around 1985-1986 petitioner "substantially rehabilitated” the building at great expense (some $400,000), in compliance with Landmarks Preservation Commission regulations, and with "an *44 emphasis on the preservation of [interior] elements of historic, aesthetic and architectural significance.” Briefly stated, petitioner restored the facade and replaced the roof, the boiler, the plumbing, the wiring, the gas piping, the kitchens (except Scott’s), and the building’s rear extension. The renovation converted what had been seven apartments into three dwelling units: a ground floor-first floor duplex; Scott’s apartment on the second floor; and a third floor-fourth floor duplex.
By in or around the spring of 1986 Scott was the only tenant remaining in the building. Pursuant to an agreement with petitioner, Scott vacated her apartment for several months in and around the summer of 1986, while a stairway was being replaced. Both sides herein agree that this hiatus in occupancy has no instant significance. Petitioner, in her moving brief, notes that the subject apartment was "relatively unaffected” by the building’s "substantial rehabilitation.”
(In view of the ratio decidendi of today’s decision, we need not resolve whether, as petitioner claims, the building "was in a dilapidated and substandard condition” at the time of purchase, or whether, as Scott claims, petitioner allowed the building to deteriorate as part of "a campaign to empty the building of its tenants” and then renovate the building for the purpose of receiving "significant tax benefits and increased rental income.” Both parties may be correct, since their respective views are not mutually exclusive.)
On September 1, 1988 petitioner and Scott entered into a two-year renewal lease. Thereafter, petitioner took the position that the "substantial rehabilitation” of the building removed the apartment from the purview of the RSL — which was the only ground upon which Scott could claim entitlement to a stabilized renewal lease — and refused to enter into another renewal lease. On August 9, 1990, Scott filed a complaint, docket No. EH-410077-RV, with DHCR (which administers the RSL), claiming entitlement to a stabilized renewal lease.
After the 1988 lease expired, petitioner commenced a holdover proceeding, Copeland v Scott (L & T index No. 101144/90 [Civ Ct, NY County]). Judge Jay Dankberg initially stayed this proceeding, pending resolution of Scott’s DHCR complaint. Upon appeal of the stay, the Appellate Term, First Department, reversed and remanded for further proceedings, and the matter was restored for a trial on January 7, 1992.
Meanwhile, DHCR was continuing to process Scott’s com *45 plaint, and on December 19, 1991 granted petitioner until January 10, 1992 to submit further affidavits and documentation. Nonetheless, on January 6, 1992, one day prior to the scheduled trial date and four days prior to the DHCR submission date, a DHCR District Rent Administrator (DRA) issued an "order directing lease renewal,” determining that Scott was entitled to a renewal lease since, as a matter of law, the building had not been "substantially rehabilitated.”
"[DHCR’s] policy and administrative review decisions have held that to qualify as a 'substantial rehabilitation^] sufficient to exempt the dwelling from rent regulations, the work must be performed in a totally vacant building and constitute the functional equivalent of a 'gut demolition.’
"The owner’s admission that the building was not vacant at the time of the renovation precluded the possibility of a 'gut demolition’. Hence, the work performed can not be considered a substantial rehabilitation sufficient to exempt the subject apartment from the provisions of the Rent Stabilization Law and Code.”
Petitioner immediately filed a request for reconsideration by the DRA and a petition for administrative review (PAR), asserting, inter alia, that she had been denied due process because the DRA had, in effect, reneged on the agreement allowing petitioner to make further submissions by January 10. In an "order reopening proceeding to reconsider rent administrator’s order no. zeh-410077-rv,” dated (issued) January 16, 1992, DHCR agreed: "The record shows that an extension was granted to the Owner upto [sic] 1/10/92, but the Order was issued on 1/6/92. Therefore due process was not fully observed.”
In an "order of revocation, modified [sic] or affirmation”, dated May 19, 1992, issued under docket Nos. ZGA-410015-RK and ZEH-410077-RV, a District Rent Administrator affirmed the January 6 order as follows:
"A review of the evidence submitted by the owner during this proceeding reveals that the owner failed to substantiate that the building had been substantially rehabilitated to the extent required, within the meaning of the Code, and based on DHCR policies and interpretations in order to be exempt from the Rent Stabilization Laws and Regulations.
"Therefore the Rent Administrator affirms that the subject apartment falls under the jurisdiction of [the] Rent Stabilization Code, and the tenant[,] who has occupied the subject *46 apartment from September 1, 1990 to present without a written lease[,] is entitled to a renewal lease.”
The owner then filed another PAR. While this was pending, in Matter of Eastern Pork Prods. Co. v New York State Div. of Hous. & Community Renewal (187 AD2d 320 [1st Dept 1992]), the First Department completely undermined the rationale of the DRA’s determination:
"The words 'substantially rehabilitated’ in ETPA § 5 (a) (5) are not technical terms, but are rather general, commonly used terms which may not be limited by judicial or administrative construction, and should be accorded their commonly understood meaning * * * If the Legislature had intended to require 'the gutting of the entire interior of the building’ while all apartments and rooms are vacant in order for the exception to apply, as DHCR ruled * * * the Legislature could easily have so specified * * *
"DHCR, in requiring that the owner’s renovations must have constituted 'gutting’ of an entire, vacant building in order to qualify for the ETPA § 5 (a) (5) exemption, employed overly rigid standards which are inconsistent with the intent and language of the statute, and unreasonable.” (Supra, at 323-325.)
It appears that after Eastern Pork (supra) was promulgated, in the instant case DHCR undertook a thorough factual examination of the subject rehabilitation. Finally, in an "order AND OPINION DENYING PETITION FOR ADMINISTRATIVE REVIEW AND MODIFYING ADMINISTRATOR’S ORDER”, dated (issued) October 15, 1993, DHCR Deputy Commissioner Joseph A. D’Agosta decided that the apartment remained subject to the RSL whether or not the building had been substantially renovated.
"The Commissioner is of the opinion that the owner’s petition should be denied, and that the Administrator’s order should be modified.
"It is uncontested that the tenant herein has been in continuous occupancy of the rent stabilized subject apartment long prior to the commencement of the renovation work in 1985 and remained in occupancy during the renovation period except for a brief time pursuant to court stipulation when repairs were made in the subject apartment. It is also undisputed that no major renovation work took place in the subject apartment. Therefore the question is presented as to whether, even if it is considered that the rest of the subject premises *47 underwent a substantial rehabilitation, an occupied rent stabilized apartment would lose its rent-stabilized status under the statutory exemption * * * Based on the equities involved — the fact that the complainant is a long term rent stabilized tenant in an apartment with very little renovation work done therein —the Commissioner is of the opinion that, even if the rest of the building were found to have been substantially rehabilitated, the subject apartment would continue to retain its rent stabilized status at least while the tenant herein maintains her occupancy in such apartment.” (Id., at 22-23, citing Matter of Eastern Pork Prods. Co. v New York State Div. of Hous. & Community Renewal, 187 AD2d 320, supra; Goodman v Ramirez, 100 Misc 2d 881 [Civ Ct, NY County 1979]; Pape v Doar, 160 AD2d 213 [1st Dept 1990]; Matter of Shubert v New York State Div. of Hous. & Community Renewal, 162 AD2d 261 [1st Dept 1990].) Although the Deputy Commissioner presented an extensive, 20-page discussion of the minutiae of the renovation, he found it unnecessary to reach the issue of whether the building had been "substantially rehabilitated.”
Petitioner then commenced the instant proceeding, arguing, essentially, that since the RSL is "unambiguous and without exception exempts any and all housing accommodations located in a building [that] has been substantially rehabilitated,” Scott is not entitled to a stabilized renewal lease.
DISCUSSION
The ETPA contains a legislative finding and declaration "that a serious public emergency continues to exist in the housing of a considerable number of persons in the state of New York * * * that a substantial number of persons residing in housing not presently subject to the provisions of the emergency housing rent control law or the local emergency housing rent control act are being charged excessive and unwarranted rents and rent increases; that preventive action by the legislature continues to be imperative in order to prevent exaction of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering, speculation and other disruptive practices * * * that in order to prevent uncertainty, hardship and dislocation, the provisions of this act are necessary” (McKinney’s Uncons Laws of NY § 8622). Section 5 (a) (5) of the ETPA (McKinney’s Uncons Laws of NY § 8625 [a] [5]) states, in full, as follows:
*48 "Housing accommodations subject to regulation
"a. A declaration of emergency may be made * * * as to all or any class or classes of housing accommodations in a municipality, except * * *:
"(5) housing accommodations in buildings completed or buildings substantially rehabilitated as family units on or after January first, nineteen hundred seventy-four”.
"[T]he basic purpose of the exemption is to increase the number of habitable family units available to the residents of our city” (Matter of Eastern Pork Prods. Co. v New York State Div. of Hous. & Community Renewal, supra, 187 AD2d, at 324) by giving owners "an investment incentive to recoup rehabilitation costs free of stabilized rents” (Pape v Doar, 160 AD2d, at 215, supra). Furthermore, the "substantial rehabilitation” exemption, "as an exception to the remedial protections of rent stabilization and having alternative parallel provisions by which owners may recoup their investment, is to be strictly construed.” (160 AD2d, at 215, supra.) One such "parallel provision” is McKinney’s Unconsolidated Laws of NY § 8626 (d), which provides that "[provision shall be made pursuant to regulations under this act for individual adjustment of rents where * * * (2) there has been * * * an increase in the rental value of the housing accommodations as a result of a substantial rehabilitation of the building * * * which materially adds to the value of the property”. This provision would be somewhat superfluous if a landlord could simply refuse to give stabilized renewal leases after a building’s "substantial rehabilitation.” Section 8626 (d) (3)’s provision for rental increases based on "major capital improvements” also appears to allow landlords to pass "substantial rehabilitation” costs on to tenants.
In what appears to be the first case to address the instant issue, Goodman v Ramirez (100 Misc 2d 881, 884, supra), then Judge (now Justice) Gammerman stated as follows:
"The language of the statute is * * * clear. It is not the housing accommodation which has to be 'substantially rehabilitated’ to exempt it from coverage, but rather the building in which it is located. The court has been unable to find any case in which subdivision (5) of section 5 is interpreted, and the legislative history of the ETPA is of no assistance. The court must, therefore, conclude that the Legislature intended what the words of the statute clearly indicate^] that a housing accommodation in a building substantially rehabilitated after January 1, 1974 is not covered by the ETPA, even though the particular accommodation at issue itself was not rehabilitated.
*49 "This interpretation of the statutory language may give rise to a situation in which an apartment previously decontrolled may become covered by the ETPA only to lose that protection if the building in which it is located is substantially rehabilitated. If this was not what the Legislature intended when it enacted subdivision (5) of section 5, then appropriate remedial action should come from the Legislature, not the court.”
In this court’s view, the statutory construction in Goodman (supra) is not compelling because it appears to ascribe legislative intent concerning the scope of the exemption to language simply delineating the existence of the exemption. The Legislature’s objective, in its briefly worded exemption, was to encourage the creation and rehabilitation of housing, not to fine tune delicate, contentious issues of rent regulation. The legislative requirement that the "building” as a whole, rather than the "housing accommodation” at issue, have been "substantially rehabilitated” for the exemption to apply was most likely worded as it was simply to raise the hurdle to a finding of "substantial rehabilitation”; i.e., rent destabilization could not be obtained simply by improving individual apartments.
This interpretation is buttressed by the pairing and equal treatment of "substantially rehabilitated” buildings with new buildings (i.e., "buildings completed * * * after January 1, 1974”) in the statute. Indeed, for all that appears, the Legislature contemplated exemptions for completely new buildings— which by hypothesis have no continuously occupying tenants —and for buildings which by virtue of a "substantial rehabilitation” are the functional equivalent of completely new buildings. This court will not read an intent to destabilize the rents of tenants who were not in the contemplation of the drafters.
(Since Goodman v Ramirez [supra] is not controlling here, but is entitled to whatever authority is bestowed by the cogency of its reasoning, and since Justice Gammerman decided to bypass the question of whether the tenant in that case, initially the resident of a class "B” multiple dwelling, was entitled to rent stabilization status in the first instance, there is no need for this court to attempt to use that difference as a distinction, as argued by respondents.)
In Pape (supra), in dicta, the Court stated that a renovation could be considered a "substantial rehabilitation” even though it did not increase the number of residential units in a building and even though it arguably restored the building to " 'excessive quality.’ ” (160 AD2d 213, 215, supra.) However, *50 the Court found that the renovation there at issue, which resulted in two of six floors being devoted to physicians’ offices, did not result in a rehabilitation " 'as family units’ (Supra, at 215-216.)
Eastern Pork (supra) explicitly opened — or at least left open —the question of Goodman’s continuing viability. "We note that in Goodman v Ramirez * * * [t]he building-wide rehabilitation was held sufficient to remove all apartments from stabilization. Although that decision was rendered in 1979, and explicitly invited remedial action from the Legislature if that result was not what the Legislature intended, no amendment has since been enacted, although we recognize that such inaction is far from conclusive as to the Legislature’s intent. We cite Goodman only as some support for the proposition that a building need not be completely vacant at the time of the renovation in order to qualify for the exemption * * * [W]e do not address the question of whether a particular rent-stabilized apartment which is occupied while substantial rehabilitation of the remainder of the building is undertaken, would lose its rent-stabilized status under the statutory exemption.” (187 AD2d, at 324, supra.) Thus, contrary to petitioner’s assertion that the Eastern Pork Court "believed that Goodman was correct on [the] issue [presented today]” (petitioner’s mem, at 23), it is clear that the First Department was not putting its imprimatur on Goodman’s reading of the scope of the statutory exemption (which, incidentally, the Court expressly referred to as a "question”).
In rejecting the "gut demolition” requirement, the Eastern Pork Court noted that under such a construction "the owner of a building containing 99 substandard and deteriorated vacant housing units, and just one occupied unit that required no rehabilitation, would not be able to recoup the cost of rehabilitating the 99 units unless he [sic] evicted the tenant in occupancy, and gutted the entire building, including the unit that required no rehabilitation. Clearly, that result would be unreasonable, and contrary to the intendment of statute.” (187 AD2d, at 324, supra.)
Under today’s decision, construed in conjunction with Eastern Pork (supra), a landlord will be able to "recoup the cost of rehabilitating the [hypothetical] 99 units”, since all of these units will be removed from rent stabilization. Furthermore, a landlord should not be able to raise the rent of a continuously occupying tenant whose apartment has not been rehabilitated since (1) there are no costs attributable to the apartment to *51 recoup, (2) the tenant has not benefitted from any improvement to the apartment, and (3) the landlord may have other means of recouping building-wide costs even from the tenant at issue. While it is true that the tenant may incur a modest benefit in the form of improvements to the common areas of the building, this alone does not justify giving the landlord the right to destabilize the tenant’s rent, which, while it may not necessarily be the case here, may in many instances effectively result in the eviction of tenants of moderate means.
Common sense and elementary fairness dictate that it is better to allow a continuously occupying tenant, who has no say in the decision to renovate a building, to receive the slight benefit of improved common areas, without having his or her rent vastly increased, and to relegate the owner, who has control over renovation decisions, to recouping his improvements from the vastly increased rents of the apartments actually rehabilitated, than it is to force the tenant to pay a vastly increased rent for an unimproved apartment, and to allow the owner to receive an escalated rent on an unimproved apartment, in addition to escalated rents on all of the improved apartments.
Renovations in which a significant percentage of apartments are not improved will not qualify as "substantial rehabilitations”. As the percentage of individual apartments being improved increases, (1) the project is increasingly likely to fall within the intendment of the "substantial rehabilitation” exception, (2) the landlord’s costs increase, and (3) the landlord increases her or his ability to recoup these costs (and, one would assume, eventually to profit) by raising rents on an increasing number of units. That the Legislature has deemed "substantial rehabilitation” to be a bright line proposition does not require that once the magic threshold is crossed a landlord should be able to raise the rents on all apartments. Allowing landlords to raise the rents on substantially all apartments will provide sufficient incentive to landlords to "rehabilitate” substandard housing stock, while protecting continuously occupying tenants against the monumental intrusion imposed, willy-nilly, by destabilized rent.
Furthermore, this court discerns, from an overview of the authorities cited by the parties herein and from several decades of observing the common, everyday experiences of ordinary New Yorkers, a covenant between the citizenry and their elected officials that rent-regulated tenants will not wake up one day to find their rents deregulated by unilateral action *52 undertaken by landlords, at least absent extraordinary circumstances. For example, Administrative Code of the City of New York § 26-511 (c) (9) provides that a "real estate industry stabilization association” code may not be adopted unless it provides that an owner shall not refuse to renew a lease except under such extraordinary circumstances as (a) where the landlord, in good faith, intends to demolish the building, and (b) where the landlord seeks personal use of the apartment as his or her primary residence. Section 2524.4 of the Rent Stabilization Code (9 NYCRR), entitled "Grounds for refusal to renew lease”, lists only owner occupancy, recovery by a not-for-profit institution, and failure by the tenant to use the apartment as his or her "primary residence” as nonrenewal grounds. While this court does not view provisions such as these as dispositive of the instant question, they convey a sense of what New Yorkers, landlords and tenants alike, have come to expect from our housing laws, expectations around which they order their personal and business affairs. Whether the aforementioned covenant is good, bad, or indifferent law and socioeconomic policy is a question that could be, and indeed is, debated at great length; today’s decision simply acknowledges its existence as one indication of legislative intent.
In the administrative decision being reviewed herein, DHCR found "persuasive * * * analogy” in the line of cases exemplified by Shubert v New York State Div. of Hous. & Community Renewal (162 AD2d 261, supra), which have held that a landlord may not circumvent RSL coverage by the simple expedient of physically combining apartments so that the total number drops below six (which, pursuant to ETPA § 5 [a] [4], is the minimum number for RSL coverage to obtain). Petitioner argues that in the classic Shubert-type case, the landlord is attempting a mere scam. This court sees no "scam” here, and would not label the situations "analogous”. (We note, however, as an example of an analogous situation in which continuously occupying tenants do retain their stabilized status, ETPA § 5 [a] [6] [McKinney’s Uncons Laws of NY § 8625 (6)], which exempts from regulation housing owned or operated by certain not-for-profit institutions "other than those accommodations occupied by a tenant on the date such housing accommodation is acquired by any such institution”.)
But the Shubert line of cases does provide a poignant example of courts acting as a bulwark against a statutory construction that is unassailable as a matter of language but *53 indefensible as a matter of public policy. There is absolutely nothing in the language of ETPA § 5 (a) (4) that is at all suggestive of an exception to the "fewer than six” exemption for instances in which the building previously had six or more dwelling units. Still, it can no longer be denied that the exception exists. Indeed, the instant petitioner has expressly disclaimed reliance on ETPA § 5 (a) (4), even though her "substantial rehabilitation” reduced the number of apartments from seven to three. Courts are not constrained to interpret statutory language with blinders to policy, context, and common sense.
Finally, we note that today’s decision is not based on any reluctant deference to DHCR’s interpretation. The Court of Appeals has stated that "DHCR’s interpretation of the statutes it administers, if not unreasonable or irrational, is entitled to deference”. (Matter of Salvati v Eimicke, 72 NY2d 784, 791 [1988].) Even so, this court has attempted a de novo exercise in "pure statutory reading and analysis” (Matter of Eastern Pork Prods. Co. v New York State Div. of Hous. & Community Renewal, supra, 187 AD2d, at 323), and has reached the same conclusion.
CONCLUSION
Astute counsel for all three parties have supplied the court with instructive authorities and arguments. The authorities demonstrate, in sum, that continuously occupying tenants are entitled to. the protections of rent regulation, and entrepreneurial landlords are entitled to the benefits of incentives to rehabilitate. In this court’s view, while the issue appears close, today’s decision properly effectuates the former without unduly burdening the latter.
Thus for the reasons set forth herein, the relief requested in the petition is denied and the petition is dismissed.